Mr. Tomzak, I'm sorry. Hey, police and court. Good morning. Honorable Justices, I'm here this morning to argue to you about the case of People v. John Byers. And I'd like to begin my argument by being slightly less eloquent than I hope to be. But what I will say to you is this. This case was a mess, from soup to nuts, from beginning to end. This case was, I'm sorry to say, as a long-time practitioner, I would consider it to have been a mess. Of no fault of the defendants at all. What we have in this case, generally speaking, we have terribly damaging defamatory evidence of a false nature being presented before a grand jury. We have a prosecutor who intentionally or otherwise fabricates evidence of a collage purportedly created by a defendant who actually rips up pieces of paper, which we believe in the hope that he, not in the hope, in the desire not to look at it. And we also have what I would consider all three of the things we look out for in criminal cases. We have the failure to provide very, very important, crucially important exculpatory evidence to a defendant until after the proofs had closed twice in this case, before the key exculpatory evidence was produced in this case. This case, I would submit, Justices, is worthy of your review. The case law that's been presented, we've really kind of boiled it down in the state and defense in our briefs. We've really boiled it down to Oliver and Hunter, the two cases we've both agreed on, on the issue of the grand jury, which is the first issue I'm going to ask Lee to address. Oliver tells us that we have to show an actual and substantial prejudicial effect, and only if without the information or with it, depending on which way you look at the opinion, would the grand jury have indicted. Truly, that's what Oliver kind of boils down to in its simplest format. So let's take a look at what this grand jury heard versus the reality of the case. What was the grand jury presented with? A defendant who was a child porn dealer with a large collection of child pornography, including pictures and videos, on multiple recording medias, with copies confirmed on and printed off a hard drive, and that the state had evidence that the defendant had distributed. That is what the grand jury in this case heard. The reality should have been the only pictures that we recovered from this defendant were from a commercial website that said all of our models are 18 years or older. These pictures were torn up and intended to be thrown in the garbage, and no other child pornography of any nature was found during the execution of our search warrant in this case. That's what the grand jury should have heard, and I ask your honors to consider, is that the standard we're at here? Would they truly have indicted had they been presented with the true facts in this case? And I would submit to you the answer to that is no. I ask you to consider, if we can, the cases which are cited both by the state and the defendant in this case. Let's look at the fabrications for the cases we're falling back on for authority in this case. In the case of Oliver, Oliver's interesting. The fabrication that resulted in the reversal in that case, or that should have granted the motion dismissed, was an officer who testified gave the illusion that he was present during a transaction. When, in essence, he was reading the notes of another officer who was present during the transaction being testified regarding. Now, he didn't testify falsely. He told the truth about what the other officer saw, but it was the simple fact that he had presented the image that he was present, that he was an occurrence witness in this case, that caused the court in Oliver to reverse with prejudice. Now, in Hunter, Hunter's a little bit stronger than that, and Hunter is a case where it involves the throwing of a couch out a window. And one of the grand jurors during the grand jury proceeding in Hunter asked, was there any evidence presented that the couch slipped or fell, or it was a mistake in some way, shape, or form? And in that case, the witness responded, no. One statement by one defendant, Mr. Hunter, stated exactly that they were removing the couch from the window, and they were throwing it out the window. When, in fact, Mr. Hunter had made a written statement, and in his written statement he said, you know, we were lowering it with a rope, and it fell. In this particular case, if we look at the degree of prejudice that we have, and I don't mean to be dramatic with you, but if I take a look at the grand jury transcript for a minute, and I have held out in pink all of the areas that were false in this transcript. It's only six pages long, but what we have in this particular instance is, we have the officer telling the truth about his name. The rest is, and most of this page is false. During the search warrant execution, Mr. Byers admitted he was the primary user of the computer. Well, that was true. And that Byers tore up the pages intending to throw them out in the garbage. That was true. The rest of these, every single one of these questions that are highlighted in pink, were false evidence presented against this defendant in the grand jury. The nature of the false evidence is important. What do we have? We have a grand jury that was presented with two indictments, two counts of the indictment, the second count being a video, a 25-second video of what purported to be child pornography. That second count was not true. That evidence did not exist. It was not found in the defendant's house. It was never recovered. It was later dismissed by the state, but the grand jury did not know that at the time it was presented. We have child pornography being offered in the grand jury, that he was a distributor of the child pornography. We have, and even to today's date in the state's brief, the state refers to the defendant's IP address. Well, this, as the facts in this case bear out, the IP address belonged to the parents. Even though he was the primary computer, the IP address belonged to the parents in this case. But the bottom line is, in front of the grand jury, we're saying we're offering these movies. Line 4, page 3 of the grand jury, there's three floppy disks, multiple media, not just a hard drive, not just papers, but a multiple media containing child pornography. Line 12, page 3, we tell the grand jury, you know what, he's refusing to answer questions when we ask them. On line 16 of page 3, and this is crucial, I ask your honors to consider this. If you read this grand jury transcript, they are telling the grand jury that an experiment, for lack of a better term, was performed on Mr. Byer's computer out at the scene. And that experiment was that they printed out the very page that formed the basis for the conviction in this case, that they printed it out from the memory of the hard drive. From the memory of the hard drive. There was nothing on that hard drive at all. Nothing. That's line 16 on page 3. That they actually printed it off. Now how could that be created? How could that be inadvertent? How could one say, especially an officer who was at the scene of the execution of the search warrant, how can that be said to be a mistake? Now, line 19 to line 23 on page 3, and this is crucial, they ask, the testimony is, and the defendant, and these children, the defendant should have known or reasonably should have known were under 18. And the officer answers yes. The bottom line is, this is a situation where somebody had this disclaimer, somebody knew it was a commercial website, somebody knew there was an admonishment that the models were 18 years or older, this evidence was never presented. Line 5, page 4, again, like I said, false actions being indicated that there was actually a computer printout created from the memory which did not exist in this case. That there was a 25 second video recorded. That a 25 second video was recorded. A computer file was found during the search warrant. And then they say that this individual had a, quote, large collection of child pornography. When in reality what he had was a torn up piece of paper that had printed off of his computer that was torn up and put in a pile intending to be put into the garbage. It goes further than that, though. So we're creating this image of the distributor with a large collection of child pornography, but somebody in that grand jury wasn't buying it. One of the grand jurors, this is page 4, line 23, page 5, line 3 to 6, the grand juror asks about getting the distributors. Is it possible to track them down, the grand juror says. And so it's clear in the grand juror's mind that he's not buying this distributor stuff at this point in time. At least somebody on that grand jury is sitting back and saying, you know, what's going on here? What's up with these? Is this guy distributing or what? And what does the state say to that grand juror? And think about Hunter, if you would, and think about Oliver, if you would. What does he say? This is the distributor. This guy is the distributor. When there simply was no evidence whatsoever of that being the case here. How different would that grand jury hearing have been, Honorable Justices, if the truth had been told to that grand jury? Would it have raised to the level had they known that this individual was told these models were 18 or older, that it was a commercial website, that there was no other pornography found, that he was not distributing them, that they could not, in fact, could not have printed off that computer, that piece of paper that forms the basis of this offense. That could not have happened. All these things were told to a grand jury. And if we look at the Oliver case again, we've got a de novo review here. And the two issues are, did the grand jury deny due process and was the defendant prejudiced by the due process? Oliver cites DiVincenzo. I submit DiVincenzo is a good guidance in this case. A due process violation may occur when a prosecutor deliberately or intentionally, first, misleads the grand jury, or, two, uses known perjured and false testimony, or, three, presents other deceptive or inaccurate evidence. And they're citing U.S. v. Hogan in there, which says that the state is duty-bound not to introduce false evidence. And, of course, this Honorable Court knows that, and we all know that. DiVincenzo goes further, though, and says, while the statements may have been inadvertent, the fact remains the defendant was prejudiced. And I ask you to consider that that standard in this particular case. I'd like to move on, if I could, to the admissibility of the tape, because the admissibility issue, if I may, is I would submit important in this case. Just give me one second. When we think about the admissibility of evidence, the briefs seem to concentrate on relevance, and I want to make it clear to this Court that we're very familiar with the proof of other crimes and the admissibility of other crimes to show intent, absence of mistake. So the relevance aspect of it is not necessarily the focus. Had it been found and could have been connected to the defendant in the proper evidentiary ways, this evidence would be admissible in the normal case of child pornography. But what do we really have here in this case, this swarming video, if you will remember what the swarming was? We have no foundation presented whatsoever. Let's look at our foundational requirements for videotapes. Truly and accurately depicts the image that it purports to show in the video. We have none of that testimony here because we have nobody who saw that video before other than the Officer Sullivan who testified in the case. That it was the other way you would bring in a tape like this would be able to use the old kind of tried and true chain of custody, good old evidentiary issues. Number one, it would be recovered from the defendant's computer so that there was a nexus between the defendant and the tape. That it was not modified in any way, shape, or form. That the hard drive and the file remain to be pure. The government would have a program to do that to make sure that we could verify that we're getting the pure computer program because we know digital images are subject and anything digital is subject to modification. And then I would submit to the court the good old fashioned chain of custody. Counsel, you have two minutes. Thank you. That it was downloaded and maintained in custody and then later presented to trial. None of that was here. What we know about this video that was admitted is one thing and one thing only. That at the most, five seconds was from the defendant's computer. At the most, five seconds of it. At most. And the rest of it was swarmed from other computers off of the LimeWire system. This in a case when the evidence forming the basis for the offense was not found on LimeWire. Had nothing to do with LimeWire. I would submit there is no case in the state where evidence was admitted that was gathered from unknown third parties' computers to be used against the defendant in this cause. How was that swarming work? I thought that was kind of a concept that I've only vaguely been aware of. Justice, what I believe the testimony was that the most that they're looking for is an identifying file name, for lack of a better term. And when you go on these sites, as I understood the testimony to be, that they can log in. If you leave your hard drive open, they can go into your hard drive and try to see what you've got in there, in other words. But all they can really do is the first three seconds. In other words, the acknowledgment that that file may have sometime been there without knowledge of the content of it. It could be in there for only two seconds. You mean the entire video? No, just the first two seconds. His videos? Yes. And it's especially important when it comes to Buyer's testimony, because Buyer testified in the statements to the officers confirmed that if he saw something, he turned it off. He shut it off, deleted it. He didn't touch it. So in this particular case, imagine if someone had looked something in their screen and said, wait a minute, this isn't right. Click. But the first three seconds or five seconds may have gotten in your computer before you could hit the button. So what do we do now? As police officers, we go online where you may have some, we have no way of knowing how much. But what did we do in this case? We gathered evidence from a whole bunch of unknown computers and said, you know what, this is John Buyer's tape. And I would submit to this court that that is simply, regardless of the relevancy issues, simply outside the rules of evidence as far as the admissibility goes. There is discretion as it comes to relevance. I think a large degree of discretion for the trial court. But when it comes to issues of foundation for evidence, I think the rules are pretty hard and fast. And they're there to require or in the hope that the evidence that is received is credible. Absolutely. Thank you. Thank you very much. Thank you. I have a quick question. Were those objections to foundation made during the course of trial? Yes. Based on chain of custody? No, not based on chain of custody. No, ma'am. We objected when it was presented based on foundation and not on chain because there was no chain. But you argued that here. No, actually, what I was trying to argue, Judge, is that's how it would be in the normal course. If you'd recovered it off of the defendant's computer in the ordinary course of the execution of the search warrant. I'm sorry if I was unclear, Your Honor. That was not my intent. Simply that in the normal course, we'd find it in the guy's computer, preserve it, maintain a chain of custody, and present it at trial. That's how it would ordinarily go. All right. Thank you. And just kind of how this was off the beaten path. Thank you. Thank you. And Mr. Ting. May it please the court. Counsel. My name is Timothy James Ting. I represent the people of the state of Illinois. Your Honor, in my time before you, I will show you why the defendant's conviction for possession of child pornography should be affirmed by this honorable court. Now, the defendant starts his appellate argument by saying that this case was a mess from beginning to end. Your Honor, I would rebut that with saying this to this court from its own words in People v. Jackson in 1986. And I quote, the defendant is entitled to a fair trial, not a perfect one. And that much the defendant received in this case. Now, as far as the issue one, the defendant waxes poetic about the dismissal of his indictment and how that was improper by the trial court, did not correctly grant that. However, there are two elements of this factor, and he only focuses on one, the unequivocal, clear denial of due process. But in actuality, there are two elements, unequivocal, clear denial of due process, and more importantly, substantial and actual prejudice. The defendant conveniently ignores this in both his brief and in oral argument today. And that is where this court should focus its attention. Regardless of whether or not the grand jury testimony may have had some inconsistencies, and Mr. Tomczak goes through page after page of highlighted paint to show this court all the errors that were wrong. I point this court to one page, the conviction order. Clear, substantial, and actual prejudice. This is the rule of law from the United States Supreme Court in U.S. v. McKinnick. And I quote, jury's subsequent guilty verdict means not only that there was probable cause to believe that the defendants were guilty as charged, but also that they are in fact guilty as charged beyond a reasonable doubt. Measured by the petit jury's verdict, then, any error in the grand jury proceeding connected with the charging instrument was harmless beyond a reasonable doubt. The standard at grand jury is probable cause. The standard at a trial is beyond a reasonable doubt, the highest standard in this criminal court, in courts and law throughout this nation. For the defendant to be convicted beyond a reasonable doubt, it makes no difference whether there was a clear denial of due process. The second element must be satisfied, and in this case, it simply was not. The defendant was convicted beyond a reasonable doubt, and he cannot claim the grand jury testimony despite all the inconsistencies which he posed. So are all grand jury errors remedied by a guilty verdict? Absolutely, Your Honor. That's what we believe. So the only ones that wouldn't be would be where the defendants found not guilty. That is correct. Which we would never see. Your Honor, that is in the United States Supreme Court holding. Again, whether or not this court has reason to differ with that or disagree with that does not make the case against the United States Supreme Court holding. Again, I appoint this court to the cases in my brief. I have not just the United States Supreme Court. I have the Seventh Circuit in United States v. Vinson. I have the Second District in People v. Hart. I have the Seventh Circuit again in Morgan and Weaver. I have the Second District in Auburn. Again and again, the standard for the second prong, actual prejudice, is whether or not their conviction was – whether or not they could be convicted. And here he was convicted. So because he was convicted, there is no semblance of whether or not there was error in the grand jury testimony. Again, there can be argument between whether or not there was actual prejudice – or not actual prejudice but denial of due process rights. And certainly the state would admit that there are, as Mr. Tomczak states, a mess. We would not use that particular word. But there were some things that were inconsistent. Nevertheless, the defendant's conviction stands, and that is what this court should look to. Now, as to issue two, the defendant states that there is no foundation whatsoever. Again, that was not typically brought up as the chain of custody. And even if it was brought up as a chain of custody objection, it does not matter. Because Chief – Deputy Chief of the Illinois Attorney General's Office, Mike Sullivan, stated particularly that the origin address of the IP protocol address was to the defendant's computer. Now, the defendant makes some argument here that the defendant's IP – it wasn't actually his address. It was actually to the Muran's and that it was not actually his computer. But I give this court actual testimony from the officer who was one of the arresting officers at the search warrant. On page 108, the defendant concedes that the computer was his and that all of the information on the hard drive was actually from his computer, even the defendant's own brief. This is from the defendant's own brief. And reciting the facts, and he states, and I quote, the defendant told him that he was the primary user of the computer and anything on the hard drive would be because of him. So the defendant's argument here that somehow the internet protocol address cannot be linked to him contradicts his own words to the police officers. He cannot claim both ways and have either of his claims have any sort of merit. And again, I would point this court particularly with issue two, the standard of view, abuse of discretion. Time and again it is held how exceptionally difficult this standard is to overcome. And I quote, it will only be found when the court's ruling is arbitrary, fanciful, unreasonable, or no reasonable person would take the view adopted by the trial court. Here, not only was the evidence of the digital video relevant, but moreover, it aided the court in the discussion of what exactly a swarming download was. Now, Justice Lynn, you had some questions regarding what exactly a swarming download was. Now, there was extensive testimony on this because it is a particularly difficult issue as far as understanding in the technical terminology what a swarming download is. But reduced to its most simplistic concept, a file sharing network has several computers that all create segments of a video so that a user can watch the video. But they all come from different sources. However, and this is the most telling commentary that you can find in the records on page 304, if I may. The trial court says, seems to me that IP address, according to the testimony, definitely supplied the beginning of the film or whatever we have here, and it definitely supplied several segments during the video as well as helping put it all together. Is that the simplest way to put it? Detective Chief Sullivan's answer, that's correct. The defendant cannot sit here and claim that it was only five seconds. Rather, the defendant's IP address had a crucial part in the file sharing of not only providing some segments of the video but moreover helping to put that video into context. All the computers work individually with having bits of those parts of that video, and then together they use that to utilize those abilities that they have to create the whole video for the user to view. That's what we have here. We have digital video evidence that was helpful and aidful for the trial court to look at the video and not just see child pornography, as the defendant says, that would be prejudicial. But it's not just being prejudicial here. It's doing something much more. It's showing relevance that the defendant cannot claim that he did not knowingly obtain child pornography when that is exactly what the digital video shows, child pornography. And we know that it was from his IP address and that he admitted he was the primary user of the computer and that anything on the computer was his. And again, look at page 108 of the record. So when we have that, I would point this court one more – to one more particular quote from the Illinois Supreme Court on that particular line. Evidence which is otherwise relevant will not be excluded merely because it may prejudice the accused or because it might arouse feelings of horror or indignation in the jury. Simply because the trial court had to sit through and watch a video of child pornography did not mean that it was unduly prejudicial. Rather, the testimony, as you will see through probably 100 pages, goes through a very systematic ordeal where the trial court is stopping and starting the tape. Did this come from the defendant's computer? Did this come from the defendant's computer? How can we tell what came from the defendant's computer? The trial court was trying to understand how a file-sharing system works because it's not something that we as common persons, not of technological advancement – and if you are, I apologize – but understand how computers work. So the deputy chief Soltman's testimony with the video being presented was extremely relevant for the trial court's consideration of how the defendant's IP address connected with the digital video pornography. As to issue three, the defendant was convicted beyond reasonable doubt. Now, there are three different elements that I would say really show why the defendant was convicted beyond reasonable doubt. One, his confession. Two, the digital video. Three, the selective destruction of the child pornography that was apprehended at his house. Now, as to the first, the defendant's confession, I will read to you some of the selected – some of the selected interview that he had with Detective Dargouze, and I quote – and if I pronounce that name incorrectly, I apologize. I think it's Dargouzees or Dargouzes. But he says, Mr. Byer told me that he had a fetish for young ladies, but that his taste had changed about six months, and that before his taste had changed, he was primarily into 18- or 19-year-olds girls. He had, however, looked at the pictures of those girls attempting to look younger, and he stated to me that he would like to receive – that he would sometimes receive pop-up ads for underage pornography. The state. Did he admit to you that he used LimeWire program to access pornography? Detective Budgebross-Witz. Yes, he did. Is LimeWire a file-sharing program? Yes, it is. Did he admit to you that he downloaded child pornography using LimeWire? Yes, he did. A defendant's confession here gives probative evidence of his guilt. As I had stated in my brief, and I used several cases, but particularly from People v. R.C. This is from the Supreme Court, and I quote, A confession is the most powerful evidence that the state can offer, and its effect on the trier of fact is incalculable. Even the trial court in the record commented on the defendant's comments. He stated, and I quote, The thing that, to be honest with you, hurts the defendant the most, I think, is the statement to the police, which I think goes a long way to indicate that he knew what he had there and knowingly did not want to get rid of it. And you can find this on the record on page 141 and 142. Secondly, the digital video downloaded of the child pornography from the defendant's internet protocol address. This is yet another instance where we know that the defendant cannot claim that he inadvertently had child pornography in his possessions when a digital video from his internet protocol address had a origin of child pornography. While that wasn't found here, there was testimony that said they didn't do an extensive sweep of this hard drive. So it may still have been on this hard drive, but the cursory hard drive analysis did not actually work to find it or discover it. But lastly, and particularly here, is the selective destruction of the pornographic images of children. We have here over 20 images of underage girls performing sexual acts, and while they are ripped to shreds, they are not ripped in such a way that it would be random. Rather, there is a selective, systematic, methodical way in which these images are ripped, ripped so that the images of underage girls performing sexual acts is still shown. And the defendant, by his selective destruction, shows his intent to cover himself even if he was inadvertently found out, which he was in this case. And, Your Honors, the defendant makes some claim as to the website that says that the individuals were over the age of 18. One, I would state that the rule of law is that there is no medical testimony that should be determined. Rather, it is well settled, and I quote, a court does not need expert testimony to determine whether the participants are underage but can rely on its own everyday observations and commonplace experiences in making this determination. This was the trial court's call, and the standard review on appeal is in the light and most favorable to the state. That means if any rational trial fact can use those logical inferences, then they can affirm and they must affirm the trial court's decision. Here, the trial court looked at this evidence and said that those were underage daughters of the so many John and Jane Doe's, that when he saw those exhibits, he stated that he had the mind, the presence of mind to state this is unequivocally, absolutely, and in all other ways child pornography. It was a rational decision to make, and this court is – its place is not to retry the defendant but merely to look at the evidence and in the light and most favorable to the state and see if any rational trial fact can make that determination. Surely, that was the case here. Is the defendant's intent important? I'm sorry, Your Honor? Is the defendant's intent important? As far as possession of child pornography? Yes. That's one of the elements of the crime. He must knowingly possess it. Okay, so if he has a website that says that all the models are 18 and over, and that's what he's downloading, where is the intent to be involved with child pornography? The intent, Your Honor, is that he had knowledge of the nature or that he should have known. This is actually the standard. The defendant either knows or reasonably should know to be under the age of 18 or to be severely or profoundly mentally retarded. That's not the case here but under the age of 18. Okay, so if the website says that they're all 18 or over, what's your showing of intent? The exhibits themselves. The exhibits themselves. The exhibits themselves, Your Honor. I mean, yes, the website does state that, but if the exhibits themselves surely and clearly contradict that claim, the defendant should know, and certainly the defendant should not be so unwise, if you might put it, to selectively destroy the exhibits but not actually discard them in the trash but put them on his desk where he can view them time and time and time again. That shows intent, Your Honor. I'm sorry, Mr. Tate. I keep a messy desk around my computer. I have a bunch of stuff sitting next to my computer that I intend to throw away that I haven't thrown away yet. Does that indicate some sort of intent on my part? It may – it shows an intent that you did not throw it away right away, but here's the part. Okay, per se – let's take your example. You have a messy desk. You did not destroy something or actually throw it away, but you intended to do it. There's a difference between getting the everyday letter in the mail and saying I'll throw that away and putting it on the desk and getting what you believe to be his child pornography, which the defendant claims. He saw a pop-up ad. He knew that it was wrong. He ripped it up. So the defendant – the whole waiver or the whole claim that the website says it's 18 years or older, if he ripped it up, clearly from his own testimony he knew that the pictures were illicit. But he ripped them up and then placed them on his desk and selectively ripped them up so that he could still see the images of sexually explicit acts of underage children. This is not the everyday letter that someone puts on their desk and forgets to discard. This is a case where there is clear intent to keep those pictures, to know what those pictures are, and to do such a thing as to deceptively mask the intent to do so. So there – thank you very much. I'm sorry. Did you have more to add? I don't know how that's clear. I mean I don't know how that intent is clear. You say it is. All right. But how is it clear? If we were to say that the intent is not clear from the mere possession of discarded child pornography images, surely the digital video that was downloaded from the origin address of the defendant's internet protocol address adds to that exponentially. Now, not only do we have the evidence presented at trial to convict him of possessing child pornography, but we have circumstantial evidence that he certainly knew about it. Remember, his computer was looked at for 13 to 14 days by the testimony of Chief Detective Michael Sullivan. So the defendant was watched for an extensive period of time, and his computer had a digital video of pornography at one point. And what that shows is that if the images alone don't take you to the point of that is actual intent or should reasonably know, then the digital video of pornography certainly gets to that point where the trier of fact can make a rational inference and state the defendant knew or should have reasonably known that he possessed child pornography. You know, maybe part of my problem in buying in completely to your argument is that I use my computer a lot, and there are things that happen on it. Like, I get emails from my law clerk, or purporting to be from my law clerk, that are in reality advertisements from Cialis. I talk to him, he's not involved with Cialis, he's not involved with selling it, but I still get emails that have his email address on it. It seems to me that there's a lot of stuff that happens. I get emails from people, and if I click on it, all of a sudden stuff starts running all through my computer, and my computer guy tells me that I've got a warrant of some sort. How can you be sure when you're dealing with something where there's a minor amount of material that's attributable to the defendant and a whole lot of other stuff? How can you be sure that he's involved with all of that? Well, Your Honors, the trier of fact – at this point, we're not retrying the defendant. We're looking at – Like I stated, this is not a piece of junk mail. This is child pornography. The defendant knew what it was. He ripped it up. He did not want it. He said he was going to discard it. So the defendant, even if it popped up, even if we take that claim and presume that's true, that it was a pop-up ad, he still knew it was illicit. He ripped it up, put it on his desk instead of immediately discarding it, instead of burning it. He did what no reasonable person would do to put it on the desk right there in plain view where he could, again, look at it time and time again, selectively destroying images. Again, this is not random ripping. This is ripping out of images so that the actual specific sexual acts of underage children are still viewable repeatedly. That – if that does not show intent, if that does not show who should have reasonably known, that a digital video with an origin source from the defendant in a file-sharing network shows a systematic way of being involved in child pornography. It again shows that intent. And if that wasn't enough, then the defendant's claim on page 108 that he liked underage children, that he liked underage girls… … that he liked models who he claims were 18 years of age or older to look younger. All of these things come to the point where the defendant is time and again giving the trier fact bits and pieces of evidence which show beyond a reasonable doubt that he surely should have known. If not known, then he should have known reasonably that the images that he had was child pornography and he did not discard them. That's how we get there, by looking at all the evidence and at the talent of the circumstances and coming to the conclusion when a defendant says that it was his computer, that he was the one who had everything on there… … that there was an origin link, the digital video from a download of child pornography, and there was the child pornography itself on his desk selectively destroyed. That shows beyond a reasonable doubt that he knew about it or he should have reasonably known.  Thank you very much, Your Honors. Do you have any more questions for me? Thank you very much, Mr. King. The first point I'd like to talk about is the fact that the computer was his, and remember, the downloading took place months before the execution of the search warrant. As the testimony of the defendant indicated, there were other individuals, a brother living in the house, a nephew living in the house. We have to look at the facts and what your client admitted doing. He admitted viewing it, printing it, and he says it was a mistake that he printed it. He meant to hit the X, but accidentally printed it, and then he possessed it when the officers were there. Those are the facts. And, Justice, there's one other fact that I would submit as important, and that is the – and Judge Rozak mentioned it in his first ruling. He said, you know, I'd really like to know what's in that hard drive, and that was one of the reasons I asked to reopen the proofs. Was that relevant because he was charged with possessing the printed paper? It really was, Judge, and if I may be allowed – Your Honor, the reason it was is on April 27th, the printout contains the date that it was printed out. The hard drive was exchanged a month before that. None of those images were expanded. None of those images were found in the hard drive. That's perfectly consistent with John Byer's testimony, that it had popped up on the screen. He didn't like what he saw. He tried to hit the delete button, printed it otherwise, and then ripped it up. And, Judge, the question I have – So have you looked at it? You've looked at the pictures that were ripped up, and in your opinion, do they depict 18-year-old girls? Judge, I can't – With Photoshop being what it is, I don't think any of us can tell, but what we can tell is one thing, Your Honor. How different would this trial have been had the State disclosed that disclaimer instead of after – twice after the proofs had closed? How different would the trial – Would the State have had the obligation to rebut that disclaimer had they properly disclosed it? How different would the whole case have gone had that been tendered early on in the case? And the position that you put the defendant in at that point in time is I objected to the timing of it being turned over, but how could I object to that evidence being turned over? The bottom line here is – And I think Your Honor was correct. Intent is the issue. If we are confronted in our lives with this and it's happening more and more, what would we want someone to do? Rip it up. Don't store it in your hard drive. Get it out of there. I don't want to see it. Rip it up. And I don't know if there would have been a way to rip this paper up or there would not have been images which would have retained after it was torn up, but the one thing we do know is how can it be torn up and the one page that said the disclaimer was not turned over? How could that happen? And why wouldn't it, Your Honor, be on his hard drive? The hard drive that Judge Rosa exudes desperately wanted to know existed on that day. Your client is not disputing that those images were found in his house on a printed piece of paper. Correct. And that's what he was convicted of, not having the video, not having the hard drive. It was a single piece of paper. And it was the trier effect that had to decide what was his intent in possessing that. Did he intend to throw it away or did he intend to keep it? And aren't you asking us to retry the case? No, Judge. I would submit no. Judge, I'm asking you to look at the fairness of what was presented from the beginning of this case to the very end of it. It began with false allegations, false evidence, false experiments being testified to in front of the grand jury. And it ended very literally after the proof had culled twice with the defendant being given, here you go, here's your disclaimer, here's your evidence that says these are all 18-year-olds, right at the very end of the case. What we're not asking you to retry the case, Judge. I'm asking you to please look at this case. Look at this guy's, the one incident he has in his life in our justice system and look how he was treated from the beginning to the very end and how it would have affected his due process rights and his right to a fair trial, especially, Judge, the proceeding that took place before the grand jury. Let me ask you that question. Mr. Teague says that once you've got a conviction, you're simply foreclosed from making any arguments about prejudice or anything that happened in front of the grand jury. I understand that, Judge. Are we? No. No, you're not. Otherwise, we would never be able to look at what, as Your Honor has alluded to, how do we adjust corrections in front of the grand jury? How do we ever make things correct in a situation? If a conviction is the only way we can come before Your Honor to show these errors that occurred, then I would submit to the court it's duty bound to look at the proceedings of the grand jury and to say, you know what, if prejudice was shown, if there was a substantial likelihood that they would have voted differently, that this is the curative process that we have for you to look at the grand jury and say no. I don't disagree with you. I just wonder about the Supreme Court mandate. Are they saying to us it doesn't matter? No, no, Judge. What are they saying? What I believe they're saying is, Your Honor, what I'm saying is that this is a situation where this individual did not get a fair trial due to several issues. The disclosure, the late disclosure of exculpatory evidence, which we had no way to know about. And I would ask Your Honor to consider this. He testified twice in this case. Twice. And both times that he was subject to cross-examination in this case, he had not been allowed full disclosure. Counsel, give one minute. And, Your Honor, I'd ask you to consider that. And what he testified to was consistent with the evidence as it finally cleared off, when the fog was gone. And I'm especially interested in the collage argument returning into this case, that these were ripped up in some strategic format. That's what was the collage argument. And the collage argument was not true. It's the same thing with the argument about the hard drive. Well, it might have been on there. We really didn't look at it. It wasn't on there. If you're going to say it's on there, say it's on there. If you're going to say it's not, then do the test and determine whether it is or not. This case is full of that type of atmosphere. And, Your Honor, especially given the fact that we offered to stipulate to the other crimes evidence. Yeah, it's child pornography. We'll stipulate to it. And what did the state do in this case? What was their intent in saying, we don't accept that stipulation so that child pornography could be played in open court? And how do we know that John Byers had any more than three to five seconds? We know his testimony is, if I see something I don't like, I turn it off. We also know, Judge, that he had a collection of adult pornography. And it was nowhere near where this stuff was located. As Your Honor indicated, it was a messy desk, and there's photographs and evidence. This was a messy desk. There was an adult collection of pornography in a cedar trunk, and there was some in a drawer in the bedroom. But none anywhere else in the house. I thank you for listening this morning, without any absence of any other questions. Thank you. Thank you, Mr. Tomczak, and thank you both for your argument today. We will take this matter under advisement and get back to you with a written disposition within a short day.